IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

BYRON N. HICKEY,                        *

     Plaintiff,                     *

vs.                                     *          CASE NO. 4:07-CV-96 (CDL)

COLUMBUS CONSOLIDATED               *
GOVERNMENT, *et al.*,
                                        *
     Defendants.
                                        *

O R D E R

Plaintiff, Byron Hickey, brings claims against the Columbus Consolidated Government, its mayor, its former mayor and several of its employees for race discrimination and retaliation. Presently pending before the Court is Defendants' Motion for Summary Judgment (Doc. 57). As discussed below, the motion is granted in part and denied in part.

INTRODUCTION

Plaintiff, a black male, is employed as a police officer with the Columbus Police Department. Plaintiff claims that he was retaliated against for supporting the race and sex discrimination complaints of a fellow officer. This alleged retaliation includes an unfavorable performance review, a lengthy administrative assignment, and a transfer to another division. Plaintiff also contends that he received more severe discipline and a less favorable assignment than

1

similarly situated white colleagues, thus giving rise to a claim for racial discrimination.

Plaintiff brings claims for discrimination and retaliation under 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1981 ("§ 1981"), and 42 U.S.C. § 1983 ("§ 1983"). Plaintiff also brings claims under Georgia state law.[1]

As discussed below, the Court finds that genuine issues of material fact exist as to the following claims:

1. Title VII retaliation claim against Columbus for the negative performance review.

2. Title VII and § 1981 retaliation claims against Columbus for the extended administrative assignment.

3. Title VII and § 1981 discrimination and retaliation claims and equal protection discrimination claims against Columbus for the transfer from Vice to Burglary and Theft.

4. Section 1981 retaliation claims against Defendants Hawk and Horiuchi for the negative performance review.

5. Section 1981 retaliation claims against Defendant Boren for the extended administrative assignment.

6. Section 1981 discrimination and retaliation claims and equal protection discrimination claims against Boren for the transfer to Burglary and Theft.

Therefore, the Court denies summary judgment as to these claims, and they shall proceed to trial. Defendants' motion for summary judgment is granted as to all of Plaintiff's other claims.

---

[1]Plaintiff's Complaint states that Plaintiff's claim is based in part upon the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* (Compl. ¶ 1.) The Complaint contains no specific factual allegations concerning age discrimination, and there is no evidence of any age discrimination. Accordingly, any ADEA claims are dismissed.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A central purpose of the summary judgment rule is "to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact. *See id.* at 323. To meet this burden, the movant may point the court to "affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993) (internal quotation marks and citations omitted). In the alternative, Defendant may show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. This is because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

Once the summary judgment movant meets its burden, the burden shifts and the nonmoving party must produce evidence to show that there *is* a genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 324. The nonmoving party "must go beyond the pleadings," *id.,* and point the Court to "specific facts showing a genuine issue

3

for trial." Fed. R. Civ. P. 56(e); *accord Celotex*, 477 U.S. at 324. The nonmoving party is not required to produce evidence in a form that would be admissible at trial, but it must point to some evidence to show a genuine issue of material fact. *Id.* Such evidence may be in the form of affidavits, depositions, answers to interrogatories or admissions on file. *Id.*; *accord* Fed. R. Civ. P. 56(e).

The movant is entitled to summary judgment if, after construing the evidence in the light most favorable to the nonmoving party and drawing all justifiable inferences in favor of the nonmoving party, no genuine issues of material fact remain to be tried. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). It is not enough to have *some* alleged factual dispute; there must be a genuine issue of material fact to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247-48. A fact is *material* if it is relevant or necessary to the outcome of the suit. *Anderson*, 477 U.S. at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party—there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Anderson*, 477 U.S. at 248.

FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiff, the record reveals the following:

## 1. The Plaintiff

Plaintiff, Byron Hickey, is a black male. He has been employed as a police officer with the Columbus Consolidated Government ("Columbus" or "the City") police department for 27 years. Plaintiff is currently a Corporal/Detective. Plaintiff was assigned to the Vice and Narcotics Unit ("Vice") from November 2004 until June 2006, and he is currently assigned to the Burglary and Theft Division.

## 2. The Defendants[2]

Defendant Columbus is a consolidated city-county government. Defendant Poydasheff, a white male, was mayor and Director of Public Safety of Columbus until January 2007. Defendant Wetherington, a white male, has been mayor and Director of Public Safety of Columbus since February 2007. The Columbus mayor is charged with the general oversight of the police department, but he is not responsible for managing and operating the police department; does not play a role in establishing, implementing or modifying police department policies; and does not have daily operational control over the police department. (Poydasheff Decl. ¶ 2, Feb. 1, 2008; Wetherington Decl. ¶ 2, Jan. 31, 2008.) Neither Poydasheff nor Wetherington had a role in making employment decisions regarding Plaintiff. (Poydasheff Decl. ¶ 3; Wetherington Decl. ¶ 3.) Plaintiff has pointed the Court

---

[2]Plaintiff sued all of the individual Defendants in their official and individual capacities. The official capacity claims are considered claims against the City. *See Smith v. Allen*, 502 F.3d 1255, 1272-73 (11th Cir. 2007) (official capacity suit is another way of pleading an action against the entity of which an officer is an agent).

to no evidence that would support any individual capacity claims against Wetherington or Poydasheff for discrimination or retaliation. Therefore, Wetherington and Poydasheff are entitled to summary judgment on Plaintiff's claims against them in their individual capacities.

Defendant Boren is, and was during the relevant timeframe, police chief of Columbus. Boren, a white male, reports to the Columbus mayor and is responsible for the overall management and operation of the police department. Defendant Hawk, a white male and captain in the Columbus police department, was commander of Vice from July 2004 until August 2006. Defendant Walton, a black male and sergeant in the Columbus police department, was Plaintiff's immediate supervisor in Vice. Defendant Horiuchi, an Asian male, was an agent in Vice. Horiuchi was promoted to sergeant in October 2005, and at that time he had some supervisory authority over Plaintiff, although Walton also maintained supervisory authority over Plaintiff.

Defendant Barron, a white male, is the director of human resources for Columbus. Plaintiff complained to Barron about Plaintiff's administrative assignment, which is discussed in detail below. However, Plaintiff has pointed the Court to no evidence that would support any claims against Barron for discrimination or retaliation; therefore, Barron is entitled to summary judgment on Plaintiff's claims against him in his individual capacity.

### 3.   Plaintiff's Vice Assignment

Plaintiff was assigned to Vice in November 2004.  He had previously worked in Vice and was an experienced drug agent.  In November or December of 2005, Hawk assigned Plaintiff and his partner, DeChon Grant, to train Alicia Davenport on Vice procedures. Davenport, a black female, was a rookie officer who had previously been on an undercover Vice assignment.  While Plaintiff and Grant were training Davenport, she told them that she had been sent on undercover assignments to nightclubs without cover or operational funds, in contravention of department policy.  (Ex. G to Defs.' Statement of Material Facts as to Which There is No Genuine Issue to be Tried [hereinafter Defs.' SMF], Pl.'s Interview at 4-5, Jan. 10, 2006.)

On December 30, 2005, Horiuchi led a briefing regarding the evening's planned operation, which was attended by Plaintiff, Grant, Davenport, and several other Vice agents.  Hawk was not at the briefing.  Horiuchi planned to send Jordan Tharp, a nineteen year-old civilian and white female, into nightclubs in downtown Columbus so that she could attempt to gain entry without identification to prove her age.  The Vice team members, including Davenport, were instructed to provide cover for Tharp.  Davenport complained that the Vice team had not provided similar cover for her when she was doing undercover

drug work.[3]  Horiuchi asked Davenport to leave the meeting.  After

Davenport left, Plaintiff told Agent Rodney Spear[4] and Horiuchi, who

supervised Plaintiff while she was undercover, "If you . . . put her

out there one time by herself, you was wrong for doing that."

Immediately after the briefing, Plaintiff learned that Davenport

believed that Walton had sexually harassed her, and Walton admitted

to Plaintiff that he had made inappropriate comments to Davenport.

After the briefing, the working conditions in Vice became tense.

Spear and Horiuchi believed that Plaintiff had attacked and betrayed

them in the briefing by taking Davenport's side without asking them

for their side of the story.  (Spear Dep. 14:10-17, Dec. 11, 2007.)

A divide began to develop between the Vice officers who were on

Davenport's side—Plaintiff and Grant—and those who were on Horiuchi

and Spear's side.  (E.g., Grant Dep. 74:3-7, Dec. 14, 2007; Josey

Dep. 44:7-10, Dec. 17, 2007.)  On January 3, 2006, Davenport met with

Hawk and Boren to complain about race and sex discrimination, and she

also submitted a written grievance.  The divide in Vice continued to

grow.  For example, shortly after Horiuchi received and read a copy

of Davenport's grievance, Horiuchi and Spear saw Davenport speaking

---

[3]According to some of the officers who attended the briefing,
Davenport objected to providing cover for a "white bitch."  (Pl.'s Resp.
to Defs.' Statement of Material Facts as to Which There is No Genuine
Issue to be Tried ¶¶ 30-31 [hereinafter Pl.'s SMF].)  Plaintiff contends
that everyone perceived Davenport's complaint to be about race
discrimination.  (Id.)

[4]Spear is a white male.

with Plaintiff and Grant while waiting for an elevator, and Horiuchi and Spear refused to ride in the elevator with them.

Davenport was removed from Vice, and the investigation into her grievance began on January 4, 2006, headed by Major Charles Rowe of the police department's Office of Professional Standards ("OOPS"). Working conditions in Vice remained tense, and rumors circulated that Plaintiff had helped Davenport with her grievance letter.[5] (*E.g.*, Josey Dep. 38:1-17; Spear Dep. 36:10-14.) Sometime after the December 30 briefing but before OOPS began interviewing agents in connection with the Davenport investigation, Hawk learned that Plaintiff supported Davenport's grievance: another Vice officer reported to Hawk that Plaintiff had called him "trying to get him to go over to his side." (Ex. 5 to Pl.'s SMF, Hawk Interview at 11.)

On January 10, 2006, Plaintiff was interviewed by three OOPS officers in connection with the Davenport investigation.[6] (Ex. G to Defs.' SMF, Pl.'s Interview.) Those officers were Rowe, Lt. Garrett, and Sgt. Bedsole. In that interview, Plaintiff told OOPS investigators about the December 30, 2005 briefing and about Walton's admissions regarding inappropriate comments Walton made to Davenport.

---

[5]In fact, Plaintiff did review Davenport's grievance before she submitted it. (Pl.'s SMF ¶ 56; Ex. G to Defs.' SMF, Pl.'s Interview at 17.) There is no evidence that anyone else knew about the review.

[6]After the December 30 briefing, Plaintiff felt that he had a duty as a police officer to report what he had learned about Davenport's treatment, and he did so in the OOPS interview. (Pl.'s Dep. 167:10-15.)

Plaintiff also told the investigators that he and Grant had been training Davenport and that Davenport had told them she had been sent on undercover assignments without funds or cover. Although Plaintiff did not have personal knowledge regarding many of Davenport's allegations, he did tell the investigators that he twice witnessed Horiuchi and Spear send Davenport to do undercover work without a wire or listening device and that Plaintiff himself had never been sent on an undercover assignment without cover. (*Id.* at 14, 18, 25.) Plaintiff also suggested to the OOPS investigators that Horiuchi and Spear did not provide cover for Davenport because they were white and Davenport was assigned to work in nightclubs where the patrons were predominately black. (*Id.* at 14.) Plaintiff also told the OOPS investigators that he had reviewed Davenport's grievance letter before she submitted it. (*Id.* at 17.)

While Defendants contend that the contents of Plaintiff's January 10, 2006 interview were not disclosed to anyone outside the OOPS team, it does not appear that the *fact* of the interviews were kept secret; Hawk knew that OOPS interviewed Plaintiff. (*E.g.*, ex. 5 to Pl.'s SMF, Hawk Interview at 11.) During the investigation into Davenport's grievance, Rowe provided Boren with periodic updates about the investigation, particularly with regard to "broad systemic problems" in Vice, but also with regard to specific testimony disclosed during the investigation, such as Plaintiff's accusation during a February 2, 2006 OOPS interview that Horiuchi misused his

City computer and specific testimony regarding Walton's inappropriate statements to Davenport. (Boren Decl. ¶¶ 12-15.) In addition, OOPS provided Hawk with information discovered during the investigation regarding departures from departmental policy. (Ex. 5 to Pl.'s SMF, Hawk Interview, at 8.)

As January progressed, the tension in Vice did not dissipate, and morale among the officers was low: as Hawk told OOPS, "People are afraid to do their job, or afraid to function in a normal manner because of people making allegations like this." (Ex. 5 to Pl.'s SMF, Hawk Interview at 9.) Hawk noted that there was a lot of hostility toward Plaintiff from other agents who felt "betrayed from inside," and Hawk noticed "some confrontations between [Plaintiff] and other agents." (*Id.*) For example, Agent David Josey, a white male, told Plaintiff that he knew Plaintiff was "behind" the investigation. (*Id.*) In addition, Hawk believed that after the Davenport investigation began, Plaintiff "totally disrupted the [Vice] Unit." (*Id.*)

On January 20, 2006, Hawk called a meeting of all Vice agents to discuss tensions in the unit that were affecting productivity and an anonymous letter sent to City Council members that (1) asked Council to monitor Davenport's grievance, (2) alleged that Hawk was having an extramarital affair, and (3) accused Hawk of incompetence and/or intentional wrongdoing in his command of Vice. (*See* Ex. 7 to Pl.'s SMF, Anonymous Letter.) During the meeting, Hawk was angry and

11

upset, and he believed that the information in the letter had come from within Vice. Hawk told the agents that Vice "is not a good place to work right now." According to Plaintiff, Hawk was staring right at Plaintiff when he made the statement, and Plaintiff considered the statement to be a direct threat. Hawk went on to tell everyone that everything in the unit would be "strictly by the book."[7] In addition, Hawk called Boren to suggest that he move Hickey out of Vice because, in Hawk's opinion, Hickey "totally disrupted the Unit." (Ex. 5 to Pl.'s SMF, Hawk Interview at 9.)

### 4. Plaintiff's 2005 Performance Review

Police officer performance reviews are completed annually. It is undisputed that Horiuchi completed Plaintiff's performance review for 2005. Walton was the senior sergeant in the unit, and he claims that he assigned Horiuchi to complete Plaintiff's performance review. (Walton Dep. 16:5-19, Aug. 10, 2007.) According to Plaintiff, however, Hawk told Horiuchi to do the evaluation, and he also told Horiuchi what to put in the evaluation. (Pl.'s Dep. 114:4-13, 115:3-9, Nov. 7, 2007.)

Horiuchi began drafting Plaintiff's performance review on January 3, 2006—the same day Davenport filed her grievance.

---

[7]Hawk explained that part of the new "by the book" practice meant that officers would no longer be allowed to attend their children's sporting events during lunch. Plaintiff contends that he was singled out because he was the only one who used his lunch hour to attend children's sporting events. However, it appears that the new rule was an across-the-board prohibition on officers doing "their own thing" during lunch. (Grant Dep. 71:2-12, Dec. 14, 2007.)

Plaintiff's performance review consisted of thirteen questions. (Ex. I to Defs.' SMF.) For each question, Horiuchi gave Plaintiff a rating. In general, each question had a maximum point value of four: an "Exceeds Standards" rating earned four points; a "Meets Standards" rating earned three points; and a "Needs Development" rating earned two points. To arrive at the final rating category, the rating points are totaled and then divided by the number of questions.

One of the questions asked for an evaluation of Plaintiff's "Knowledge, Skills, and Abilities." Horiuchi prepared to answer this question in part by pulling a computer report of Plaintiff's arrest statistics on January 4, 2006.[8] (Ex. 9 to Pl.'s SMF, Investigator's Report, Jan. 4, 2006.) Horiuchi decided that Plaintiff's arrest statistics were very low, although Plaintiff had never been formally counseled or disciplined for his arrest statistics, and Horiuchi gave Plaintiff a "Needs Development" rating in "Knowledge, Skills and Abilities." Horiuchi told Hawk and Walton that he planned to give Plaintiff this rating. However, neither Hawk nor Walton instructed Horiuchi that departmental policy required Horiuchi to give Plaintiff ninety days' written notice and a chance to improve before downgrading an element of Plaintiff's performance rating. Horiuchi

---

[8]Although Defendants point to evidence that Horiuchi decided to downgrade Plaintiff's performance review and discussed this decision with Walton and Hawk prior to December 30, 2005, the fact that he did not run the report regarding Plaintiff's arrest statistics until January 4, 2006 is sufficient to create a fact issue as to when Horiuchi decided to downgrade Plaintiff's score.

did not provide Plaintiff with the requisite notice and opportunity to improve.

Plaintiff met with Horiuchi on January 19, 2006 to discuss Plaintiff's 2005 performance review. Plaintiff received a final score of 3.35, which translates into a final rating category of "Meets Standards."[9] Plaintiff noted on the performance review that he did not concur with the rating. Plaintiff gave Horiuchi and Hawk an objection to the evaluation on January 20, 2006, and the objection was received in Boren's office that afternoon.[10] (Ex. 15 to Pl.'s SMF, Pl.'s Evaluation and Objection at 9-10.) That same day, Hawk signed off on the evaluation. OOPS received the objection on January 23, 2006 (Ex. K to Defs.' SMF, Pl.'s Comment), and Plaintiff filed a second objection with Boren on January 24, 2006 (Ex. L to Defs.' SMF, Letter from Pl. to Boren). In both objections, Plaintiff noted that Horiuchi had not provided him with notice of unsatisfactory performance as required by police department policy and that Plaintiff believed he received the poor performance review "as a result of [] being a witness in Officer Alicia Davenport's unfair treatment and sexual harassment grievance." (E.g., Ex. K to Defs.' SMF, Pl.'s Comment at 1.) In his January 24 letter to Boren, Plaintiff characterized himself as a witness "for" Davenport. (Ex.

---

[9]The Court notes that if Horiuchi had given Plaintiff a "Meets Standards" rating on "Knowledge, Skills and Abilities," Plaintiff's score would have been 3.42, still "Meets Standards."

[10]Plaintiff turned in his objection after the meeting in which Hawk said that Vice "is not a good place to work." (Pl.'s Dep. 123:1.)

Ex. L to Defs.' SMF, Letter from Pl. to Boren at 1.)  Boren did not sign off on the performance evaluation; instead, he ordered an OOPS investigation of it.

As part of the OOPS investigation into Plaintiff's grievance, OOPS investigators interviewed Plaintiff on February 2, 2006.  During that interview, Plaintiff repeatedly noted that he had not had any problems with his Vice colleagues until Davenport filed her grievance and he supported her.  (*E.g.* Ex. P to Defs.' SMF, Pl.'s Interview at 1, 6, Feb. 2, 2006.)  Defendants point out that Plaintiff said that the problem was "a right and wrong thing," not a "race thing."  (*Id.* at 2.)  In his deposition, Plaintiff clarified that he meant that his Vice colleagues were saying that Plaintiff and Davenport were "pulling the race card," but Plaintiff supported Davenport because "[w]hat they did to her was wrong, and they did it to her because she was black."  (Pl.'s Dep. 161:14-162:18.)

After the investigation into Plaintiff's grievance, Boren agreed that Plaintiff should not have been given a "Needs Improvement" rating in "Knowledge, Skills and Abilities."  Therefore, Boren rescinded the original evaluation and corrected the "Knowledge, Skills and Abilities" score to "Meets Standards."  In addition, Plaintiff was upgraded in two categories he did not complain about: his "Attendance and Punctuality" rating was increased from "Meets Standards" to "Exceeds Standards," and his "Conforms to Department Policies" score was increased from "Needs Development" to "Meets

15

Standards." As a result, Plaintiff's final score for 2005 was 3.58, which still gave him a final rating category of "Meets Standards." (Ex. 16 to Pl.'s SMF.) Although the subject matter of his objection–the "Knowledge, Skills and Abilities" score–was resolved by the new evaluation, Plaintiff still refused to concur with the evaluation because the form listed Horiuchi as his supervisor.

**5.   Plaintiff's Administrative Assignment**

On January 26, 2006, Plaintiff was involved in an off-duty shooting incident near his home. Plaintiff was not suspected of wrongful conduct, but he was placed on administrative assignment pursuant to standard departmental policy following the use of force, pending the required internal investigation of the incident. While on administrative assignment, Plaintiff worked in Support Services, and his work assignments were overseen by a Support Services supervisor. Hawk, Horiuchi and Walton did not have input into or authority over Plaintiff's work assignments. (Boren Decl. ¶ 20.) While on administrative assignment, Plaintiff was not permitted to drive a police car, carry a weapon or engage in off-duty law enforcement or security-related jobs. Prior to his administrative assignment, Plaintiff worked a part-time security job at the Carl Gregory car dealership, where he was paid $22.00 per hour and worked three or four four-hour shifts per month.

OOPS investigated Plaintiff's use of force incident.[11]  It is undisputed that the investigation took several months and that Plaintiff was not happy with the length of the investigation.  In April 2006 Plaintiff requested a meeting with Mayor Poydasheff and City Manager Isaiah Hugley.  On April 10, 2006, Plaintiff met with Poydasheff and Hugley in the Mayor's office.  Chief Boren and City Attorney Clifton Fay were also present.  During that meeting, Plaintiff complained about his January evaluation and Horiuchi and Hawk's alleged misuse of City computers.  Plaintiff also stated that he wanted to return to his active duty Vice assignment.  In addition, Plaintiff says that he told Poydasheff, Hugley, Boren and Fay that there were double standards, racism, and selective enforcement in the police department and that black officers were treated differently than white officers.[12]  (Pl.'s Dep. 173:1-13.)  Plaintiff spoke of this alleged racial discrimination in general terms but did not provide specific examples.  (Pl.'s Dep. 181:6-184:10.)  Poydasheff told Plaintiff that the police department's investigation into his grievances would continue and that Boren would handle the matter, and Boren said that Plaintiff would not be going back to Vice.

Defendants claim that the investigation into Plaintiff's use of force incident took several months because it was "inter-related"

---

[11]It appears that OOPS interviewed all of the witnesses to the use of force incident on January 26, 2006.  (*See generally* Ex. 39 to Pl.'s SMF.)

[12]Poydasheff and Hugley do not recall such statements, and their meeting notes do not reflect such statements.

with the investigation of Davenport's grievance, which expanded into an investigation of Vice, as well as the investigation of Plaintiff's objection to his performance review. (Defs.' SMF ¶¶ 42, 88.) However, Rowe testified that the use of force investigation had nothing to do with the other two investigations. (Rowe Dep. 74:9-15, Dec. 14, 2007.) Defendants also claim that the investigative process was "complicated by a staff shortage." (Defs.' SMF ¶ 42.) It is undisputed that the investigation into Plaintiff's use of force incident took much longer than other use of force investigations pending during the same timeframe. While Plaintiff was on administrative assignment pending investigation, OOPS investigated two other shooting incidents. First, on February 10, 2006, a Patrol officer was dispatched to a residence, where he found a suspect threatening two individuals with a knife. The suspect stabbed a man and was threatening to stab a woman, and the officer shot the suspect twice, injuring him. On February 13, 2006, the officer was placed on administrative leave with pay. On March 16, 2006, the officer was returned to his regular Patrol duties. (Ex. 38 to Pl.'s SMF 15, 17.) Second, on May 25, 2006, a Vice officer was serving a search warrant, and he discharged his service weapon when a dog attacked him. The shooting resulted in no injuries to the dog or any person. On May 26, 2006, the officer was placed on administrative assignment pending investigation of the shooting, and on June 1, 2006 he was exonerated and released from administrative duty. (Ex. 45 to Pl.'s SMF 9-10.)

Rowe sent Boren a memorandum with the results of the investigation into Plaintiff's shooting incident on May 8, 2006; the investigation exonerated Plaintiff. (Ex. 39 to Pl.'s SMF 5.) Boren sent Plaintiff a memorandum on June 5, 2006, notifying Plaintiff that he had been exonerated in the shooting incident. (Ex. 39 to Pl.'s SMF 6.) It is undisputed that Plaintiff asked Boren to return him to active duty in Vice. It is undisputed that Boren refused to assign Plaintiff back to Vice. It is also undisputed that Boren refused to give Plaintiff an active duty assignment until Plaintiff agreed to an assignment other than Vice. When Plaintiff agreed to a non-Vice assignment, he was released from administrative assignment and placed in the Bureau of Investigative Services, Burglary and Theft Division, effective June 19, 2006. (Ex. 39 to Pl.'s SMF 15.)

Defendants contend that Boren did not put Plaintiff back in Vice because Boren planned to break up the Vice unit and essentially clean house.[13] (Defs.' SMF ¶ 92.) Boren did relieve Hawk of his command in July 2006. In addition, a number of Vice officers—including Hawk, Horiuchi, Walton and Spear—were removed from Vice in July and August of 2006 as a result of the Davenport investigation. However, other

---

[13]Defendants also suggest that Plaintiff was not psychologically ready to return to active duty after the shooting incident and that Boren left the decision to return to active duty in Plaintiff's hands. However, the undisputed evidence is that Plaintiff sought to be returned to active duty in Vice but was not permitted to do so. Defendants further suggest that Plaintiff was not returned to Vice because he could not work effectively with Hawk and because Plaintiff's skills "would be more effectively utilized" in burglary and theft investigations. (Defs.' SMF ¶ 100.)

Vice agents, including David Josey,[14] Bill Tuning, and Kenny Herring, were permitted to remain, and despite continued requests after the completion of the investigations, Plaintiff was not returned to Vice.

## 6. Plaintiff's EEOC Charge

Plaintiff filed a racial discrimination and retaliation charge with the Equal Employment Opportunity Commission ("EEOC") on July 13, 2006. Plaintiff noted in his EEOC charge that Davenport, a black female, "filed an unfair treatment and sexual harassment claim" against Hawk, Walton, Horiuchi and Spear. (Ex. E to Defs.' SMF, Pl.'s 1st EEOC Charge at 2, July 13, 2006.) In general, the EEOC charge refers to Davenport's complaint as a "sexual harassment complaint," but Plaintiff noted in the charge that he complained to Poydasheff, Hugley, Boren and Fay about "the serious race problem and the serious gender problem in the Columbus Police Department." Plaintiff also specifically noted that his EEOC charge was related to Davenport's EEOC charge, which detailed allegations of race and sex discrimination.

## 7. Subsequent Events and Alleged Continued Retaliation

Plaintiff gave two interviews to the Columbus Ledger-Enquirer regarding this case. In an article published on November 26, 2006, Plaintiff was reported to have said that much of the misconduct he observed in Vice "seemed to be precipitated by race" and that

---

[14]Boren issued Josey a Letter of Counsel based on findings in the Davenport investigation. (Defs.' SMF ¶ 102.)

"[g]ender [] played a role in Davenport's situation." (Ex. W to Defs.' SMF at 4.) In an article published on July 12, 2007, Plaintiff is quoted as saying: "What they did to [Davenport] and what they did to me was wrong . . . It's a matter of public concern. People in this community need to know what's going on." (Ex. X to Defs.' SMF.)

Plaintiff contends that Defendants continued to retaliate against him for supporting Davenport's grievance and for speaking up about racism and sexism in the Columbus police department. For example, Plaintiff contends that during the spring of 2007 Defendants "conspired to . . . attempt to entrap [Plaintiff] into committing the criminal offense of obstruction of justice."[15] (Ex. Y to Defs.' SMF, Pl.'s 2d EEOC Charge at 2, Dec. 4, 2007.) In support of his claim, Plaintiff points to a Notice of Interception from the Assistant United States Attorney, notifying Plaintiff that the telephone of Larry Lightning, a former Columbus police officer, was tapped from March 12, 2007 to April 10, 2007. Plaintiff also points to evidence that an agent of the federal Drug Enforcement Agency ("DEA") called Plaintiff on April 9, 2007 and asked Plaintiff about a suspected drug dealer previously investigated by Plaintiff. The DEA agent also asked Plaintiff if there was any connection between Lightning's son and the suspected drug dealer. However, Plaintiff points the Court

---

[15]The Title VII claim based on this alleged retaliation is not before the Court because Plaintiff's second EEOC charge is still pending. The Section 1981 claim based on the alleged retaliation is before the Court.

to no evidence that any of the Defendants were involved in asking Plaintiff questions during the investigation, that there was a retaliatory motive for asking Plaintiff questions during the investigation, or that there was any adverse action.[16]  Accordingly, Defendants are entitled to summary judgment as to any claims based on the DEA investigation.  *See Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (noting that prima facie case of retaliation requires adverse action and a causal connection between protected activity and the adverse action).

Plaintiff also contends that after he was assigned to Burglary and Theft his supervisor, Sgt. Pratt, subjected Plaintiff to heightened scrutiny by telling him to shave his mustache and by attempting to give him a "meets expectations" rating rather than an "exceeds expectations" rating in one category of his 2007 performance review.  However, Plaintiff points the Court to no evidence that Sgt. Pratt had a retaliatory motive for his actions or that he even knew about Plaintiff's complaints of retaliation and discrimination. Therefore, Defendants are entitled to summary judgment as to any claims based on Sgt. Pratt's "heightened scrutiny" of Plaintiff.  *See Carroll*, 529 F.3d at 970.

---

[16]Plaintiff's assertion that he was "targeted as allegedly being part of a 'Black Mafia'" (Pl.'s SMF ¶ 116) is based on pure speculation, as is Plaintiff's claim that the DEA agent called Plaintiff solely to "entrap Plaintiff into calling Larry Lightning to give him a 'heads up' that the DEA was looking at his son." (Pl.'s SMF ¶ 114.)

Finally, Plaintiff contends that he will never be promoted to sergeant, the next step in his career ladder, because Boren will continue to retaliate against him indefinitely.[17] This assertion is completely speculative. Furthermore, it is undisputed that Plaintiff has not sought promotion to sergeant and that Plaintiff is not qualified for promotion to sergeant because he has never passed the sergeant's exam. Therefore, Defendants are entitled to summary judgment as to any claims based on the failure to promote Plaintiff to sergeant. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004) (noting that prima facie case for failure to promote requires that plaintiff be qualified for and apply for promotion).

## 8. Plaintiff's Claims

Plaintiff brings the following claims: (1) Title VII claims against Columbus for race discrimination and retaliation, (Compl. ¶¶ 27-30); (2) § 1983 claims against Defendants for race discrimination and retaliation in violation of § 1981 and the Equal Protection Clause of the Fourteenth Amendment,[18] (Compl. ¶¶ 32-33); (3) § 1983 claim against Defendants for violation of Plaintiff's First Amendment rights, (Compl. ¶¶ 35-36); (4) state law claim against Columbus for negligent retention and supervision, (Compl. ¶¶ 38-42); (5) and state

---

[17]In support of this assertion, Plaintiff simply states, "If [Boren] won't put me back in [Vice], he damn sure won't promote me." (Pl.'s Dep. 210:22-24.)

[18]Plaintiff may not recover for retaliation under an equal protection theory. *E.g., Ratliff v. DeKalb County, Ga.*, 62 F.3d 338, 341 (11th Cir. 1995). Defendants are therefore entitled to summary judgment on any retaliation claims based upon a denial of equal protection.

law claim against Defendants for intentional infliction of emotional distress. (Compl. ¶¶ 44-46).

DISCUSSION

## I.  Title VII Claims

Plaintiff brings Title VII claims against Columbus for disparate treatment and retaliation. Specifically, Plaintiff claims that (1) Boren gave Plaintiff less desirable assignments than he gave white officers; (2) Hawk and Horiuchi gave Plaintiff a negative performance review in retaliation for Plaintiff's support of Davenport's complaint; (3) Boren placed Plaintiff on a lengthy administrative assignment in retaliation for Plaintiff's support of Davenport's complaint; and (4) Boren transferred Plaintiff from Vice to Burglary and Theft in retaliation for Plaintiff's support of Davenport's complaint.[19]

### A.  Disparate Treatment

Title VII prohibits discrimination against an employee because of his race. 42 U.S.C. § 2000e-2. Plaintiff has no direct evidence of discrimination, so the Court will employ the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008). Under the *McDonnell Douglas* scheme, Plaintiff has the burden to make

---

[19]As discussed above, Defendants are entitled to summary judgment on Plaintiff's complaints of retaliation following his transfer to Burglary and Theft because Plaintiff failed to show a causal connection between the protected activity and the adverse action or because Plaintiff has not shown that he suffered an adverse action.

a prima facie case of discrimination. He may do so by showing that (1) he is a member of a protected class, (2) he was qualified to do the job, (3) he was subjected to an adverse employment action, and (4) his employer treated similarly situated employees outside his protected class more favorably. *Id.* Here, it is not disputed that Plaintiff is a member of a protected class or that Plaintiff was qualified to be an agent in Vice. Defendants contend, however, that Plaintiff has pointed the Court to no evidence of an adverse employment action or of more favorable treatment of similarly situated white comparators.

### 1. *Disparate Discipline*

In support of his disparate treatment claim, Plaintiff contends that he was subjected to harsher discipline than white officers Josey and Spear. Specifically, Plaintiff contends that he was placed on administrative assignment while OOPS investigated his off-duty shooting incident, but Josey and Spear were not placed on administrative assignment while OOPS investigated Davenport's claims of discrimination against them. The Court cannot conclude that Josey and Spear were similarly situated to Plaintiff because they were not "involved in or accused of the same or similar conduct." *McCann*, 526 F.3d at 1374 (internal quotation marks omitted). Josey and Spear's alleged conduct subject to the OOPS investigation was not "nearly identical" to the conduct for which Plaintiff was being investigated. Plaintiff's off-duty shooting incident required that

he be placed on administrative assignment pursuant to the City's use of force policy. To consider Josey and Spear to be similarly situated would be to "confus[e] apples with oranges." *See id.* (internal quotation marks omitted). Accordingly, the Court finds that Plaintiff has not met his burden of making a prima facie case of discrimination with regard to his administrative assignment, and Defendants are entitled to summary judgment on this claim.[20]

### 2. Disparate Assignment

Plaintiff also claims that he suffered disparate treatment when Boren kept white officers Josey and Bill Tuning in Vice but did not assign Plaintiff back to Vice.[21] Defendants contend that Plaintiff's assignment to Burglary and Theft was not an adverse employment action for purposes of Plaintiff's discrimination claim. To prove an adverse employment action under Title VII's anti-discrimination clause, Plaintiff must show "a *serious and material* change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001). A transfer to a different position can be an adverse employment action if it involves a reduction in prestige or responsibility. *Hinson v. Clinch County,*

---

[20]For the same reasons, the City and Boren are entitled to summary judgment as to Plaintiff's § 1981 claims regarding discrimination based on disparate discipline. *See Springer v. Convergys Customer Mgmt. Group, Inc.*, 509 F.3d 1344, 1347 n.1 (11th Cir. 2007) (per curiam) ("Both Title VII and § 1981 have the same requirements of proof and present the same analytical framework.").

[21]Defendants do not seriously dispute that Josey and Tuning are similarly situated to Plaintiff for purposes of the disparate assignment analysis. All three were agents in the Vice unit.

*Ga. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000). Here, Plaintiff has pointed to evidence that a transfer out of Vice was a form of punishment. (*E.g.*, Defs.' SMF ¶ 102 (noting that Hawk, Walton and Spear were transferred out of Vice as a result of the Davenport investigation).) Therefore, the Court finds that Plaintiff has pointed to sufficient evidence that a reasonable person in his position would view the transfer as adverse. *See Hinson*, 231 F.3d at 829. For these reasons, the Court finds that Plaintiff has pointed to sufficient evidence to make out a prima facie case of discrimination with regard to the transfer from Vice to Burglary and Theft.

Since Plaintiff has established a prima facie case of discrimination, the burden shifts to Columbus to offer a legitimate nondiscriminatory reason for the transfer. *See McCann*, 526 F.3d at 1373. The City contends that (1) Boren wanted to "clean house" in Vice as a result of the Davenport investigation and (2) Plaintiff is better suited to work in Burglary and Theft than in Vice. However, Plaintiff points to evidence that these proffered reasons are pretext for discrimination. First, Boren did not "clean house" in Vice. He permitted Josey, a white agent who was reprimanded as a result of the Davenport investigation, to remain in Vice.[22] He also permitted Bill

---

[22]Defendants also suggest that although many Vice officers were transferred as part of the "house cleaning," Josey was permitted to remain because he had the best arrest statistics. This proffered reason is inconsistent with Defendants' "house cleaning" reason, particularly since part of the rationale behind the house cleaning was to remove from Vice

Tuning, another white agent, to remain in Vice. Second, the evidence suggests that Plaintiff was an experienced drug agent who was suited to work in Vice. For all of these reasons, the Court finds that summary judgment is not appropriate as to Plaintiff's Title VII discrimination claim based upon the transfer from Vice.

## B.  Retaliation

Title VII prohibits retaliation against an employee because he opposed an unlawful employment practice. 42 U.S.C. § 2000e-3(a). To make a prima facie case of retaliation, Plaintiff must show that (1) he engaged in activity protected under Title VII, (2) he suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse action. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).

### 1.  *Protected Activity*

Plaintiff contends that he engaged in protected activity by opposing the unlawful conduct of race and sex discrimination and retaliation in the following ways: (1) on January 10, 2006, Plaintiff was a witness for Davenport in the OOPS investigation of her complaint; (2) on January 20 and 24 and February 2 of 2006, Plaintiff complained that he received a negative performance review and that he believed his score was related to his participation in the Davenport investigation; and (3) on April 10, 2006, Plaintiff complained to

officers—like Josey—whose bad practices were discovered during the Davenport investigation.

City officials, including the mayor, City manager, City attorney, and police chief, about his January review and Boren's refusal to return Plaintiff to Vice, and he also made general accusations about racism and selective enforcement in the police department.

Plaintiff seeks protection under the opposition clause of Title VII's anti-retaliation provision, which prohibits retaliation against an employee who has "opposed any practice made an unlawful employment practice by [Title VII]."[23]  42 U.S.C. § 2000e-3(a).  The City does not seriously deny that Plaintiff "opposed" certain practices, but it does contend that he did not have a reasonable belief that the City had engaged in an unlawful employment practice.  An employee who seeks protection under the opposition clause must have a good faith, reasonable belief that his employer engaged in an unlawful employment practice.  *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1352 (11th Cir. 1999).  When Plaintiff met with the OOPS investigators on January 10, 2006, he had a good faith belief that the City had engaged in unlawful activity.  First, with regard to Davenport's undercover assignment, Plaintiff told the investigators that he had observed Davenport being sent on undercover assignments without a wire or listening device, that Davenport confided in Plaintiff that

_____

[23]Plaintiff also contends that his activities fall within the protections of the participation clause, which prohibits retaliation because "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  Because the Court finds that Plaintiff's conduct is protected under the opposition clause, the Court need not determine what, if any, conduct is also protected by the participation clause.

she had not been provided with cover or funds for the assignment, that Spear did not immediately deny sending Davenport out without cover, and that Plaintiff (a male) had never been treated that way on an undercover assignment. Plaintiff suggested to the OOPS investigators that Horiuchi and Spear did not provide cover for Davenport because they were white and Davenport was assigned to work in nightclubs where the patrons were predominately black. Plaintiff also told the OOPS investigators what Walton and Grant told him about Walton's alleged sexual harassment of Davenport.[24] For all of these reasons, the Court finds that Plaintiff has pointed to sufficient evidence to create a genuine issue of material fact as to whether Plaintiff had an objectively reasonable belief that Davenport had been subjected to race and sex discrimination.

The Court also finds that Plaintiff has pointed to sufficient evidence to create a fact issue on the question whether Plaintiff had an objectively reasonable belief that he was retaliated against for opposing the race and sex discrimination of Davenport. Defendants argue that Plaintiff did not have a reasonable belief that he was

---

[24]The conduct opposed need not actually be sexual harassment to give rise to an objectively reasonable belief that it is, but it must be "close enough." *Clover*, 176 F.3d at 1351. Plaintiff reported to OOPS that Walton approached Davenport several times and asked her to sit on his lap and give him some tongue. Plaintiff also reported that Walton admitted behavior that he believed Davenport perceived to be sexual harassment, though Walton believed it was just "playing." Even if this is not close enough to "sufficiently severe or pervasive" conduct required for actionable harassment, the other evidence still supports Plaintiff's belief that Davenport had been subjected to unfavorable working conditions because of her sex and race.

retaliated against *because of* any protected activity, since Plaintiff's protected activity initially took place in the OOPS investigation, which was supposed to be confidential. However, Plaintiff has pointed the Court to evidence that other Vice agents were openly hostile to Plaintiff because they believed he supported Davenport's grievance. Therefore, when Plaintiff was interviewed by OOPS on January 10, Plaintiff could reasonably infer that his Vice supervisors and colleagues believed that he was testifying as a witness "for" Davenport.[25] Furthermore, Plaintiff left no doubt as to his position when he wrote Boren a letter on January 24, 2006: he characterized himself as a witness "for" Davenport. Thereafter, when Plaintiff participated in the OOPS investigations and other discussions regarding Davenport's treatment, as well as the investigation into the alleged retaliation against him, his position was clear: he opposed the unlawful treatment of Davenport. For all of these reasons, the Court finds that Plaintiff has pointed to sufficient evidence to create a genuine issue of material fact as to whether Plaintiff had an objectively reasonable belief that he was retaliated against for supporting Davenport's complaint of race and sex discrimination.

---

[25]Plaintiff has also pointed the Court to evidence that certain aspects of the OOPS investigation were disclosed to Hawk and Boren, such that the contents of Plaintiff's interview were not actually confidential, and that he often observed Rowe speaking with Hawk and Boren and believed that Rowe discussed the investigation with them.

*2. Adverse Employment Action and Causation*

Having found that Plaintiff has pointed to sufficient evidence that he engaged in protected activity, the Court now turns to the question whether Plaintiff suffered an adverse employment action because of the protected activity. In the retaliation context, an "adverse employment action" is one that a reasonable employee would find "materially adverse," which means that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). While Title VII does not immunize employees "from those petty slights or minor annoyances that often take place at work and that all employees experience," it does prohibit actions "that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Id.* (internal quotation marks omitted); *see also Carroll*, 529 F.3d at 974 (finding that unfavorable performance review that affected employee's eligibility for merit pay increase was materially adverse).

To establish a causal connection between Plaintiff's protected activity and the adverse action, Plaintiff must show that the decision-maker was aware of the protected conduct and "that the protected activity and the adverse action were not wholly unrelated." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) (abrogated on other grounds in *Burlington N.*, 548 U.S. at 68)

(internal quotation marks omitted). "For purposes of a prima facie case, close temporal proximity may be sufficient to show that the protected activity and the adverse action were not wholly unrelated." *Id.* (internal quotation marks omitted).

### i. 2005 PERFORMANCE REVIEW

Plaintiff contends that the 2005 performance review, which downgraded Plaintiff in "Knowledge, Skills, and Abilities," was a materially adverse action. Defendants argue that the performance review was not materially adverse because the evaluation was rescinded and did not affect Plaintiff's pay. That the evaluation was never implemented and that Plaintiff's salary was based upon a more favorable evaluation are immaterial: an employer may not escape Title VII liability "by correcting their discriminatory and retaliatory acts after the fact." *Carroll*, 529 F.3d at 972. Furthermore, the Court concludes that there is a jury issue as to whether Plaintiff's performance review was materially adverse. On one hand, Plaintiff's final 2005 performance review score was in the same "Meets Standards" range as the score Horiuchi gave him. *See Cain v. Green*, 261 F. App'x 215, 217 (11th Cir. 2008) (per curiam) (performance review giving employee second highest rating instead of highest rating was not a materially adverse action because it had no impact on employee's employment *and* there was no evidence a reasonable employee would find it materially adverse). On the other hand, Columbus police department policy provides safeguards before an

officer's performance rating in any element can be downgraded, suggesting that a downgraded performance score in one category is more than a "petty slight" or "minor annoyance" and that a downgraded score could therefore deter victims of retaliation from complaining.

The next question is whether Plaintiff has pointed to sufficient evidence to create a genuine issue of material fact on causation. The Court finds that he has. As discussed above, Plaintiff has pointed to sufficient evidence to create a genuine issue of material fact as to whether Plaintiff's Vice supervisors and colleagues, including Horiuchi and Hawk, were aware that he testified "for" Davenport in the OOPS interview. Furthermore, there is a very close temporal proximity between the protected activity and the adverse action: Horiuchi gave Plaintiff his negative performance review on January 19, 2006—just a little more than a week after he engaged in the protected activity of testifying for Davenport in the OOPS investigation. Hawk signed off on the negative performance review the very next day. For these reasons, the Court finds that Plaintiff has made out a prima facie case of retaliation with regard to the performance review.

Since Plaintiff has established a prima facie case of retaliation, the burden shifts to the City to articulate a legitimate, non-retaliatory reason for the challenged employment action. *See, e.g., Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008). The City asserts that the negative

evaluation was justified because Plaintiff's arrest statistics were low. However, Plaintiff has pointed to evidence to show that this proffered reason is pretext for retaliation: Hawk and Horiuchi were not permitted to give the negative evaluation unless they first gave Plaintiff notice and an opportunity to improve, but they ignored clear departmental policy and went ahead with the evaluation anyway. Accordingly, the Court denies the City's motion for summary judgment as to the negative performance review.

### ii. ADMINISTRATIVE ASSIGNMENT

It is not seriously disputed that Plaintiff's administrative assignment was a materially adverse action: Plaintiff was not permitted to earn money at his part-time security job, and Plaintiff was not permitted to wear a police uniform or carry a weapon. The question is whether the administrative assignment was retaliatory. There is no question that two days before the assignment was made, Boren received a letter stating that Plaintiff supported Davenport's claim of discrimination and complaining that Plaintiff was retaliated against for that support. It is also undisputed that Plaintiff was kept on administrative assignment despite asking to return to active duty. Therefore, the Court finds that Plaintiff has made out a prima facie case of retaliation with regard to the administrative assignment.

The City asserts that the assignment was made pursuant to standard departmental policy that required an administrative

assignment following a use of force incident. It is true that the initial assignment was lawful, but that is not the decision with which Plaintiff finds fault. Rather, Plaintiff's complaint is related to the *length* of his administrative assignment: Plaintiff contends that Boren stalled Plaintiff's return to active duty in retaliation for Plaintiff's protected activity, which continued throughout the administrative assignment. Defendants assert that Plaintiff remained on administrative assignment because the investigation into his shooting incident was complicated and intertwined with the investigation into Davenport's grievance and Plaintiff's grievance. Defendants also contend that the investigation into the shooting incident was prolonged because OOPS was short staffed. However, Plaintiff has pointed the Court to evidence that these proffered reasons are pretext for retaliation. First, there is evidence that the use of force investigation was wholly separate from the other investigations. (Rowe Dep. 74:9-15.) Second, while two other use of force investigations that occurred during the same time period were resolved in a month or less, Plaintiff did not receive news of his exoneration until more than four months after he began his administrative assignment, and Boren waited nearly a month after receiving Rowe's report to notify Plaintiff that he had been exonerated. Therefore, a jury could conclude that the City kept Plaintiff on an extended administrative

assignment in retaliation for his protected activity, and the City's motion for summary judgment on this claim is denied.

### iii. TRANSFER TO BURGLARY AND THEFT

Plaintiff contends that his transfer to Burglary and Theft was a materially adverse action taken in retaliation for his protected activity. A fact issue exists on the question of causation. While the investigation into the complaints of Davenport and Plaintiff continued, Plaintiff repeatedly complained of retaliation and discrimination. He also asked to be returned to Vice, but he was refused, and Boren would not return Plaintiff to active duty until Plaintiff agreed to an assignment outside of Vice. Accordingly, a jury could conclude that Plaintiff's transfer to Burglary and Theft was retaliatory.

The remaining question is whether the transfer was a materially adverse action. As discussed above, the Court found that a reasonable jury could conclude that the transfer was an adverse employment action for purposes of Plaintiff's discrimination claim. Likewise, the Court concludes that genuine issues of material fact exist as to whether the transfer meets the lower "materially adverse" standard for purposes of Plaintiff's retaliation claim. *See Burlington N.*, 548 U.S. at 68 (noting that a materially adverse action is one "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."). Defendants correctly assert that a purely lateral transfer resulting in no

serious and material change in pay, prestige or responsibility is not an adverse employment action. However, Plaintiff has pointed to evidence that a transfer out of Vice was a form of punishment, suggesting that such a transfer might dissuade victims of retaliation from complaining. (*E.g.*, Defs.' SMF ¶ 102 (noting that Hawk, Walton, Horiuchi and Spear were transferred out of Vice as a result of the Davenport investigation).) Therefore, a fact issue exists as to whether the transfer was a materially adverse action. Thus, the Court finds that Plaintiff has made out a prima facie case of retaliation with regard to the transfer to Burglary and Theft.

Defendants offer the following nonretaliatory reasons for the transfer: (1) Boren wanted to "clean house," so virtually everyone was removed from Vice, and (2) Plaintiff is better suited to work in Burglary and Theft than in Vice. Plaintiff has pointed to evidence from which a reasonable factfinder could conclude that these reasons are pretext for retaliation. First, Boren did not actually clean house in Vice. Rather, he permitted David Josey—an officer who was reprimanded as a result of the Davenport matter—Bill Tuning and Kenny Herring to remain in Vice. Second, the evidence suggests that Plaintiff was perfectly well suited to work in Vice and had no problems—until he complained of discrimination and retaliation. Accordingly, the Court denies the City's motion for summary judgment as to Plaintiff's Title VII retaliation claim based on the transfer to Burglary and Theft.

## II. Section 1981 and Equal Protection Claims

As discussed above, Plaintiff's Title VII retaliation claims based on the negative performance review and the extended administrative assignment, as well as Plaintiff's Title VII discrimination and retaliation claims based on the transfer from Vice to Burglary and Theft survive summary judgment. Plaintiff also asserts § 1981 and equal protection claims against the City and individual Defendants based on the same conduct. *See Springer*, 509 F.3d at 1347 n.1 ("Both Title VII and § 1981 have the same requirements of proof and present the same analytical framework."). Since Plaintiff may not recover for retaliation under an equal protection theory, Defendants are entitled to summary judgment on any retaliation claims based upon a denial of equal protection. *E.g., Ratliff v. DeKalb County, Ga.*, 62 F.3d 338, 341 (11th Cir. 1995). The remaining question is whether Plaintiff may recover under an equal protection discrimination theory and § 1981 retaliation and discrimination theories.

### A. § 1981 and Equal Protection Claim against the City

Plaintiff brings § 1981 and equal protection claims against the City under § 1983. *See Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1273 n.3 (11th Cir. 2008) ("Section 1983 constitutes the exclusive remedy against state actors for violations of the rights contained in § 1981." (internal quotation marks omitted)). Section 1983 provides a constraint on claims against governmental entities: the

39

discrimination complained of must be "a custom or policy of the governmental entity." *Webster v. Fulton County, Ga.*, 283 F.3d 1254, 1257 n.8 (11th Cir. 2002); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (plurality opinion); *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978). A "policy" is a decision officially adopted by a municipality or "created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005) (internal quotation marks omitted). A "custom is a practice that is so settled and permanent that it takes on the force of law." *Id.* (internal quotation marks omitted). Only an official with "final policymaking authority may render the municipality liable under § 1983." *Id.* (internal quotation marks omitted). Under appropriate circumstances, municipal liability may be imposed for a single decision by a final policymaker. *Id.* (citing *Pembaur*, 475 U.S. at 480).

The question whether an official has final policymaking authority on a particular issue is a question of law. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). State and local law "determine whether a particular official has final policymaker authority for § 1983 purposes." *Cooper*, 403 F.3d at 1221. The question here is whether Boren is the City's final policymaker with regard to Columbus police department employment decisions *or*, if he is not, whether the final policymaker ratified Boren's decision. *Cf.*

40

*Matthews v. Columbia County*, 294 F.3d 1294, 1297 (11th Cir. 2002) (per curiam) (discussing ratification theory of municipal liability). The parties have pointed the Court to no authority on either side of this issue. Based upon the present record, the Court finds that at a minimum genuine issues of material fact exist as to whether Boren is the final policymaker for Columbus with regard to police department employment decisions. Therefore, summary judgment is not appropriate as to Plaintiff's retaliation claims against the City based upon Boren's employment decisions.

With regard to Plaintiff's claims based on his negative performance review by Horiuchi and Hawk, the Court concludes that Plaintiff has pointed to no evidence suggesting a policy or custom of retaliatory negative evaluations that may be attributed to the City. He has pointed to evidence suggesting that Horiuchi and Hawk retaliated against him for supporting Davenport's claim of race discrimination, but he has pointed to no evidence that there was any custom or practice "so settled and permanent that it [took] on the force of law," *Cooper*, 403 F.3d at 1221, no decision by a final policymaker with authority to make such a decision, and no evidence that would support liability based on a theory of ratification. In fact, Boren refused to implement the negative evaluation after Plaintiff objected to it. Accordingly, municipal liability is not appropriate. For these reasons, the City is entitled to summary

judgment on Plaintiff's § 1981 claim based on the negative performance review.

Turning to Plaintiff's § 1981 retaliation claim based on the extended administrative assignment and his retaliation and discrimination claims based on the transfer from Vice to Burglary and Theft, the Court finds that these claims may proceed against the City. Both actions were taken by Boren, whom the Court finds for summary judgment purposes is the final policymaker for the City with regard to police department employment decisions such as transfers and discipline. A single decision by a final policymaker may constitute a "policy" such that municipal liability attaches where, as here, the final policymaker made a "'deliberate choice to follow a course of action . . . made from various alternatives.'" *Cooper*, 403 F.3d at 1223 (quoting *Pembaur*, 475 U.S. at 483) (omission in original). For these reasons, the Court denies the City's motion for summary judgment as to Plaintiff's § 1981 retaliation claims based on the lengthy administrative assignment, as well as Plaintiff's § 1981 and equal protection discrimination and § 1981 retaliation claims based on the transfer from Vice to Burglary and Theft.

B.  § 1981 and Equal Protection Claims Against Individual Defendants

Plaintiff also brings § 1981 and equal protection claims against the Defendants in their individual capacities. Specifically, he

brings § 1981 retaliation claims against Horiuchi and Hawk[26] for the negative performance review, § 1981 retaliation claims against Boren for the extended administrative assignment, and § 1981 and equal protection claims against Boren for the transfer from Vice to Burglary and Theft. Defendants contend that they are entitled to qualified immunity for their actions.

Qualified immunity shields public officers acting within the scope of their discretionary authority from liability so long as their acts do not violate clearly established law. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation . . . protecting from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001)). To receive qualified immunity, an officer must show that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Id.* (internal quotation marks omitted). Here, Plaintiff does not dispute that the individual defendants were acting within the scope of their discretionary authority when the allegedly wrongful acts occurred.

---

[26]Plaintiff has not pointed to any evidence that would support a claim against Walton, so the Court grants summary judgment as to Plaintiff's claims against Walton in his individual capacity.

After a defendant establishes that he was acting within his discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. In determining whether qualified immunity is appropriate, the courts apply a two-part test. First, the court must determine whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the officer's conduct violated a statutory or constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Rioux*, 520 F.3d at 1282. If no right would have been violated under the plaintiff's version of the facts, there is no need for further inquiry. *Lee*, 284 F.3d at 1194. If, however, the plaintiff's version of the facts establishes a violation of a right, the court must then determine whether the right was clearly established at the time of the officer's conduct. *Saucier*, 533 U.S. at 201. A right is clearly established if it is "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope*, 536 U.S. at 739. The unlawfulness of the action must be apparent in light of pre-existing law, but there is no requirement that the very action in question has been previously held unlawful. *Id.*

"Even at the summary judgment stage, not all defendants entitled to the protection of the qualified immunity defense will get it." *Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002). The protection of qualified immunity is only warranted at the summary

44

judgment stage if the Defendants can "establish that there is no genuine issue of material fact preventing them from being entitled to qualified immunity." *Id.* "[I]f the evidence at the summary judgment stage, viewed in the light most favorable to the plaintiff, shows there are facts that are inconsistent with qualified immunity being granted, the case and the qualified immunity issue along with it will proceed to trial." *Id.* In other words, the Court must consider Plaintiff's "best case" and decide whether Defendants committed a violation of clearly established law. *Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (2005).[27]

Section 1981 ensures the right to be free from intentional racial discrimination in the making and enforcing of contracts, including employment contracts, and the Equal Protection Clause ensures a right to be free from intentional discrimination based upon race. Here, as discussed above, Plaintiff's "best case," if believed, would establish that Horiuchi, Hawk and Boren intentionally retaliated against Plaintiff for his opposition to unlawful employment practices and that Boren intentionally discriminated

---

[27]The Court notes that *Robinson* was an excessive force case, so even though the facts had to be viewed in the light most favorable to the plaintiff, the question whether the officer's use of force was unreasonable and therefore a constitutional violation had to be determined from the perspective of the officer. *Robinson,* 415 F.3d at 1255. In this case, the key question is simply whether there is sufficient evidence from which a jury could conclude that Defendants intentionally discriminated against Plaintiff because of her race or intentionally retaliated against her for complaining of racial discrimination.

against Plaintiff because of his race.[28]  At the time of the events giving rise to this lawsuit, it was clearly established that such discrimination and retaliation was unlawful.  *See, e.g., Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004) (noting, in May 2004, that 1991 amendment to § 1981 provides a cause of action for racial discrimination relating to the conditions of employment); *Williams v. Consol. City of Jacksonville*, 341 F.3d 1261, 1268, 1272 (11th Cir. 2003) (recognizing equal protection right to be free from employment discrimination); *Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1412-13 (11th Cir. 1998) (recognizing retaliation claims under § 1981).  Accordingly, Boren, Horiuchi and Hawk are not entitled to qualified immunity at this stage because there are genuine issues of material fact as to whether they committed acts which, if they occurred, violated clearly established law. Defendants' motion for summary judgment is therefore denied.

---

[28]Defendants point to no evidence that this case should be viewed as a mixed motive case, where an official may act lawfully despite having a retaliatory or discriminatory intent, so long as the official would have made the same decision if he had lacked the retaliatory intent.  *Cf. Foy v. Holston*, 94 F.3d 1528, 1534-35 (11th Cir. 1996) (noting that qualified immunity should be granted where the defendant's acts were motivated by lawful considerations, even if there is *also* evidence that there was an unlawful motivation).  Here, the Court determined that a jury could find that the reasons proffered by the Defendants for taking the adverse employment actions are pretextual, meaning that the jury could disbelieve the proffered reasons and conclude that Defendants had retaliatory and/or retaliatory rather than lawful motives for their actions and that Defendants would not have taken the same actions but for Plaintiff's race and/or protected activity.

## III. First Amendment Claim

In addition to his employment discrimination claims, Plaintiff contends that Defendants retaliated against him for making statements regarding discrimination and retaliation in the Columbus police department, thereby violating his First Amendment right to exercise free speech.[29] A public employee has a "right to engage in free speech and self-expression while participating in public and social affairs." *Morris v. Crow*, 142 F.3d 1379, 1381 (11th Cir. 1998). "Absent extraordinary circumstances, such protection is unavailable, however, 'when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of personal interest.'" *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)). Therefore, "for a government employee's speech to have First Amendment protection, the employee must have (1) spoken as a citizen and (2) addressed matters of public concern." *Boyce v. Andrew*, 510 F.3d 1333, 1341 (11th Cir. 2007) (per curiam). This is because "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, . . . a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency . . . ." *Connick v. Myers*, 461 U.S. 138, 147 (1983).

---

[29]As discussed below, the Court finds no First Amendment violation. Therefore, Boren is entitled to qualified immunity, *see Saucier*, 533 U.S. at 201, and the Court need not analyze whether the retaliation complained of is a policy or custom of the City such that Plaintiff's claim may be asserted pursuant to § 1983, *see Monell*, 436 U.S. at 694-95.

The fact that the matters addressed in the speech may be of general interest to the public does not alone make it of "public concern" for First Amendment purposes. *Morris*, 142 F.3d at 1381.

Furthermore, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). In other words, if the government employee is "speaking as an employee, there can be no First Amendment issue, and the constitutional inquiry ends[.]" *Boyce*, 510 F.3d at 1343. Thus, the Court must determine whether Plaintiff "spoke on behalf of the public as a citizen" or "spoke for [himself] as an employee." *Id.* (internal quotation marks omitted). In making this determination, the Court must look to the primary purpose of Plaintiff's speech, taking into account the content, form and context of the statement. *Id.* at 1346; *accord Morris*, 142 F.3d at 1382. Not only must the "speech be related to matters of public interest, but the *purpose* of the expression must be to present such issues as matters of 'public' concern." *Morris*, 142 F.3d at 1382.

Plaintiff appears to contend that he was speaking as a citizen on a matter of public concern (1) when he spoke up for Davenport on December 30, 2005; (2) when he participated in the Davenport investigation on January 10, 2006; (3) when he wrote his objections to the performance review on January 20 and 24, 2006; (4) when he

48

participated in the investigation into his grievance on February 2, 2006; and (5) when he spoke with the mayor and other City officials on April 10, 2006.[30]  For the reasons discussed below, the City is entitled to summary judgment on all of Plaintiff's First Amendment claims.

### A.   December 30, 2005

On December 30, 2005, the Vice officers attended a briefing to prepare for the evening's mission.  During the briefing, Davenport complained that she was not always provided with cover on her undercover assignment.   In response, Plaintiff told Spear and Horiuchi, "If you . . . put her out there one time by herself, you was wrong for doing that."  While this statement is critical of the other officers, the Court finds that it was made in a closed meeting pursuant to Plaintiff's official duties as a police officer to keep his fellow officers safe.  Therefore, the Court concludes that when Plaintiff made his comment on December 30, 2005 he was speaking as an employee rather than as a citizen on a matter of public concern. Accordingly, the December 30, 2005 comment is not entitled to First Amendment protection.

---

[30]Plaintiff also filed an EEOC charge and made comments to a local newspaper after his transfer to Burglary and Theft.  As discussed above, Plaintiff's post-transfer claims for retaliation fail either because Plaintiff has not shown a causal connection between the protected activity and the adverse action or because Plaintiff has not shown that he suffered an adverse action.   Therefore, the Court need not determine whether Plaintiff's post-transfer speech is protected by the First Amendment.

B. <u>January 10, 2006</u>

In connection with the investigation into Davenport's complaint, Plaintiff gave a voluntary statement to OOPS investigators on January 10, 2006. He told the investigators about problems Davenport experienced during her tenure in Vice. Again, these statements were made in a closed meeting pursuant to Plaintiff's official duties as a police officer to keep his fellow officers safe. Therefore, the Court finds that Plaintiff's January 10, 2006 comments are not entitled to First Amendment protection.

C. <u>January 20, 2006 and January 24, 2006</u>

In his January 20 and January 24 letters to Boren and his supervisors, Plaintiff focused primarily on his own working conditions and sought to improve his work environment. Therefore, the Court concludes that the letters were "not intended to address matters of public concern from the perspective of a citizen." *Boyce*, 510 F.3d at 1345; *see also id.* at 1344 ("A public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run." (internal quotation marks omitted)). For these reasons, the Court concludes that Plaintiff's January 20 and January 24, 2006 letters are not entitled to First Amendment protection.

D. <u>February 2, 2006</u>

On February 2, 2006, Plaintiff spoke with OOPS investigators regarding his own claim of retaliation, related to the negative

performance review.  His statement—again, in a closed meeting—focused on his own working conditions and was made in an effort to improve those conditions.  *See Boyce*, 510 F.3d at 1344 (finding that workers' complaints about workload were primarily complaints about their jobs and not complaints about the employer's ability to fulfill its mission).  While Plaintiff did discuss alleged misconduct by other Vice agents that might well be of interest to the public, that was certainly not the primary purpose of his speech; it appears to have been an afterthought to Plaintiff's main complaint regarding his working conditions.  Therefore, the Court finds that Plaintiff's February 2, 2006 comments are not entitled to First Amendment protection.

E.  April 10, 2006

On April 10, 2006, Plaintiff met with Poydasheff, Hugley, Boren and Fay for an airing of grievances.  While Plaintiff does contend that he discussed racism in the police department in general terms, the "main thrust" of his complaints were personal: he voiced objections to his January evaluations, complained about his supervisors, expressed discontent regarding the length of his administrative assignment, and asked to be returned to active duty in Vice.  *See Boyce*, 510 F.3d at 1346.  Again, the Court concludes that Plaintiff's key focus was on his own working conditions and that his speech was "not intended to address matters of public concern from the perspective of a citizen."  *Boyce*, 510 F.3d at 1345.  Plaintiff's

April 10, 2006 comments are therefore not entitled to First Amendment protection.

## IV.  State Law Claims

In addition to his federal law claims, Plaintiff brings claims under Georgia law against the City for negligent retention and supervision and against the City and individual Defendants for intentional infliction of emotional distress.  Defendants assert that they are entitled to immunity on these claims.

The City is entitled to summary judgment as to all of Plaintiff's state law claims because it is entitled to sovereign immunity.  The doctrine of sovereign immunity protects governments, including counties,[31] from suit unless they have waived their immunity.  *Williams v. Whitfield County*, 289 Ga. App. 301, 302-03, 656 S.E.2d 584, 586 (2008).  A county's sovereign immunity "may only be waived by a legislative act which specifically provides that sovereign immunity is waived and the extent of such waiver."  *Id.* at 302, 656 S.E.2d at 586.  Here, Plaintiff has not established any waiver of immunity by the City, and the City is therefore entitled to summary judgment on Plaintiff's state law claims.  *See Doss v. City of Savannah*, 290 Ga. App. 670, 675-76, 660 S.E.2d 457, 462 (2008) (finding city was entitled to sovereign immunity on plaintiff's negligent retention, hiring and supervision claim because plaintiff

---

[31]The City is a consolidated city-county government, and the Court views the City as a county for purposes of the sovereign immunity inquiry. *See Bowen v. Columbus*, 256 Ga. 462, 462-63, 349 S.E.2d 740, 741-42 (1986).

had not established any waiver of immunity); *cf. Richardson v. Dougherty County, Ga.*, 185 F. App'x 785, 791 (11th Cir. 2006) (affirming grant of immunity to county on employee's state law claims against his former employer).

Turning to Plaintiff's claim for intentional infliction of emotional distress against the individual Defendants, a suit against a governmental employee sued in his individual capacity "is barred by official immunity where the public official has engaged in discretionary acts that are within the scope of his or her authority, and the official has not acted in a wilful or wanton manner; with actual malice; or with the actual intent to cause injury." *Brown v. Penland Const. Co., Inc.*, 281 Ga. 625, 625-26, 641 S.E.2d 522, 523 (2007). Plaintiff does not seriously dispute that the individual Defendants were engaging in discretionary acts when they made the employment decisions giving rise to this case. *Cf. Doss*, 290 Ga. App. at 675, 660 S.E.2d at 462 (finding that employment decisions are types of discretionary functions).

The next question is whether Defendants acted in a wilful or wanton manner, with actual malice, or actual intent to cause injury. "Actual malice" means "a deliberate intention to do wrong, and does not include 'implied malice,' i.e., the reckless disregard for the rights or safety of others." *Murphy v. Bajjani*, 282 Ga. 197, 203, 647 S.E.2d 54, 60 (2007). A "deliberate intention to do wrong" is "the intent to cause the harm suffered by the plaintiffs." *Id.*

Similarly, "actual intent to cause injury" means "an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury." *Kidd v. Coates*, 271 Ga. 33, 33, 518 S.E.2d 124, 125 (1999) (internal quotation marks omitted). Here, Plaintiff contends that Defendants acted with intent to cause him severe emotional distress by giving him an unfavorable performance review, placing him on a lengthy administrative assignment, and a transferring him out of Vice. However, Plaintiff's allegations of malice are nothing more than acts of wrongdoing done "with reckless disregard for the [rights] of others." *Murphy*, 282 Ga. at 203-04 & n.6, 647 S.E.2d at 60.[32] Accordingly, the Court finds that the individual Defendants are entitled to official immunity, and summary judgment is granted as to Plaintiff's state law claims against them.

CONCLUSION

For the reasons discussed above, the Court grants Defendants' motion for summary judgment as to the following claims:

1.    Title VII and § 1981 discrimination claims against the City, except those based on the transfer from Vice to Burglary and Theft.

---

[32]Even if the individual Defendants were not entitled to immunity on Plaintiff's intentional infliction of emotional distress claim, Plaintiff has not pointed to sufficient evidence in support of this claim. Plaintiff has not pointed to sufficient evidence to show that he suffered severe emotional distress, and it is not clear that he has sufficient evidence of extreme and outrageous conduct. *See Udoinyion v. Re/Max of Atlanta*, 289 Ga. App. 580, 584, 657 S.E.2d 644, 648 (setting forth elements of intentional infliction of emotional distress claim).

2. Title VII retaliation claims against the City other than those based on the negative performance review, the extended administrative assignment, and the transfer to Burglary and Theft.

3. Section 1981 retaliation claims against the City other than those based on the extended administrative assignment and the transfer to Burglary and Theft.

4. Equal protection claims against the City, except those based on Plaintiff's transfer from Vice to Burglary and Theft.

5. First Amendment claims.

6. State law claims.

7. Claims against the following defendants in their individual capacities: Poydasheff, Wetherington, Walton, and Barron.

8. Claims against Boren in his individual capacity as to any claims other than the § 1981 retaliation claims based on the extended administrative assignment and the § 1981 and equal protection claims based on the transfer to Burglary and Theft.

9. Claims against Hawk and Horiuchi in their individual capacities as to any claims other than the § 1981 claim based the negative performance review.

The Court denies Defendants' motion as to the following claims, which are the only claims remaining to be tried:

1. Title VII retaliation claim against the City for the negative performance review.

2. Title VII and § 1981 retaliation claims against the City for the extended administrative assignment.

3. Title VII and § 1981 discrimination and retaliation claims against the City for the transfer from Vice to Burglary and Theft.

4. Section 1981 retaliation claims against Hawk and Horiuchi for the negative performance review.

5.   Section 1981 retaliation claims against Boren for the extended administrative assignment.

6.   Section 1981 discrimination and retaliation claims and equal protection discrimination claims against Boren for the transfer to Burglary and Theft.


IT IS SO ORDERED, this 25th day of August, 2008.



                                        S/Clay D. Land
                                           CLAY D. LAND
                                    UNITED STATES DISTRICT JUDGE